LOCAL DIVISION 589, AMALGAMATED TRANSIT UNION, AFL–CIO, CLC, Plaintiff, Appellant,

v.

The COMMONWEALTH OF MASSACHUSETTS, et al., Defendants, Appellees.

LOCAL DIVISION 589, AMALGAMATED TRANSIT UNION, AFL–CIO, et al., Plaintiffs, Appellees,

v.

The COMMONWEALTH OF MASSACHUSETTS, et al., Defendants, Appellants.

LOCAL DIVISION 589, AMALGAMATED TRANSIT UNION, AFL–CIO, Plaintiff, Appellee,

v.

The COMMONWEALTH OF MASSA-CHUSETTS, Defendant, Appellee,

Massachusetts Bay Transportation Authority, Defendant, Appellant.

Nos. 81–1180, 81–1198 and 81–1219.

United States Court of Appeals, First Circuit.

Argued June 2, 1981.

Decided Sept. 30, 1981.

On Motion For Rehearing Oct. 23, 1981.

Linda R. Hirshman, Chicago, Ill., with whom Jacobs, Burns, Sugarman & Orlove, Chicago, Ill., Earle Putnam, Gen. Counsel, Douglas Taylor and Gromfine, Sternstein, Rosen & Taylor, P. C., Washington, D. C., were on brief, for Local Division 589, Amalgamated Transit Union.

Dwight Golann, Asst. Atty. Gen., with whom Francis X. Bellotti, Atty. Gen., Mitchell J. Sikora, Jr., Bruce E. Mohl, Stephen M. Limon, Asst. Attys. Gen., Boston, Mass. and Max Beck, Legal Intern, were on brief, for The Com. of Mass., et al.

Joseph Elcock, Gen. Counsel, Boston, Mass., with whom Ronald G. Busconi, Asst. Gen. Counsel, Boston, Mass., was on brief for the Massachusetts Bay Transportation Authority.

William J. Riley and Flamm, Kaplan, Paven & Feinberg, Boston, Mass., on brief for the Boston Lodge 264, District 38, Intern. Ass'n of Machinists and Aerospace Workers.

Before CAMPBELL, BOWNES and BREYER, Circuit Judges.

BREYER, Circuit Judge.

This case raises two difficult and important sets of questions concerning collective bargaining and rapid transit. First, can the Commonwealth of Massachusetts enact statutes that are inconsistent with assurances that its Transit Authority previously gave the Secretary of Labor as part of an application for federal grant money? Second, do those Massachusetts statutes unconstitutionally impair pre-existing collective bargaining contracts? We find that insofar as federal law is concerned, the state statutes are valid.

I

A

Since 1912 appellant, Local 589 of the Amalgamated Transit Union (the "Transit Union") has represented most Boston transit system employees. Before 1947, it negotiated contracts with the system's private owners (Boston Elevated Railway). Since 1947, it has negotiated with the system's public owner, which is now the Massachusetts Bay Transportation Authority (MBTA).[1] The MBTA is a public agency with power to enter into binding agreements on behalf of the Commonwealth.[2]

On January 1, 1973, the Transit Union and the MBTA entered into a detailed agreement setting forth wages, hours and working conditions. We shall refer to that agreement as the Basic Agreement. Its most important provisions for present purposes are those governing the procedure for changing its terms.

As read literally, the Basic Agreement provides that its terms will remain in effect forever unless (1) *both* parties agree to a change *or* (2) an arbitration panel changes the Agreement's terms. The Agreement invokes a type of arbitration called "interest arbitration." Unlike "grievance arbitration," which involves the interpretation and application of existing contractual provisions, "interest arbitration" involves the creation of new substantive contractual terms, which will govern the parties' future relations.[3] To be more specific, the 1973 Basic Agreement provides:

a) The Basic Agreement and its provisions shall continue in force until December 31, 1975 "and from year to year thereafter unless changed by the Parties" after appropriate notice. (§ 600)

b) After appropriate notice the contract will "be opened up and the change or changes desired shall then be considered...." "Upon failure to reach a mutual agreement upon any of the changes desired ... the same shall be arbitrated as provided for in this Agreement and the Award shall then be entered into and become a part of this Agreement." (§ 601)

c) Arbitration is to be conducted by a "Board of Arbitration selected in a manner provided in Section 103." (§ 100)

d) The Board of Arbitration shall consist of three members, one selected by the

---

1. In 1947, Boston Elevated Railway was purchased by a public entity, the Metropolitan Transportation Authority (MTA). As a result of the takeover, MTA workers became public employees; Section 19 of the enabling act, Chapter 544 of the Acts of 1947, authorized the MTA to bargain collectively and to submit contract disputes to binding interest arbitration.

2. In 1964, Congress enacted the Urban Mass Transportation Act of 1964, 49 U.S.C. §§ 1601–1613. Under that statute, federal money flows only to state and local public bodies and agencies. 49 U.S.C. § 1602(a)(1). In order to take advantage of the available federal funds, the Massachusetts legislature converted the MTA to the MBTA in 1964. Mass.Gen.Laws Ann.

ch. 161A. Pursuant to state law, "[t]he authority is authorized and directed from time to time to take all necessary action to secure any federal assistance which is or may become available ... for any of the purposes of this chapter...." Mass.Gen.Laws Ann. ch. 161A, § 29 (cum.supp.1981). The MBTA is also authorized "to bargain collectively with labor organizations representing employees of the authority and to enter into agreements ... with such organizations...." Mass.Gen.Laws Ann. ch. 161A, § 19 (cum.supp.1981).

3. For a discussion of interest arbitration, see F. Elkouri & E. Elkouri, How Arbitration Works, 47–48, 50–57 (3d ed. 1973).

Transit Union, one by the MBTA, and the third chosen from a list of five provided by the American Arbitration Association (through a process of successive striking) of "persons experienced in transportation." (§ 103)

As provided in these sections, the Basic Agreement was "opened up" at the end of 1975. The parties could not agree about the changes they had separately proposed, and they proceeded to arbitration. In 1976, the arbitration panel entered an award changing the Basic Agreement in various ways. But the arbitrators did not change the Agreement's procedure for making changes. And, they stated that "all provisions of the Agreement which are not modified by this Award shall continue in effect." They ruled that the Basic Agreement, as modified, would extend through December 31, 1977.

At the beginning of 1978, the Basic Agreement was again "opened up." Again the parties could not agree about the changes they had separately proposed. This time, however, they did not proceed to arbitration. In May, the Transit Union sought arbitration—and the MBTA began to prepare for arbitration. But in July, the Massachusetts legislature enacted a statute, Chapter 405 of the Acts of 1978. This statute, designed to hold down rapidly ris-ing transit costs, mandated an arbitration procedure somewhat different from that contained in the Basic Agreement. The Transit Union immediately claimed that Chapter 405 was itself inconsistent with the Basic Agreement; and it insisted upon Basic Agreement-type arbitration. The MBTA believed that Chapter 405 was lawful, and it insisted upon Chapter 405-type arbitration.

The impasse was resolved on August 8, 1979 when the parties entered into a "Memorandum of Understanding." The Memorandum began by stating "that the Articles of Agreement entered into as of January 1, 1973, as amended shall be further amended as follows." The Memorandum went on to make a host of changes in the Basic Agreement, but it did not change the "interest arbitration" provisions in any relevant respect.[4] The Memorandum extended the Basic Agreement as modified by stating "The express term of the Articles of Agreement shall be January 1, 1978, to and including December 31, 1980." In signing the Memorandum, however, the MBTA wrote, "Approved as to form to the extent not inconsistent with Chapter 405 of the Acts of 1978."

At the end of 1980, the Basic Agreement[5] was once again opened up and the parties

---

4. The Memorandum did change sections 600 and 601 (Basic Agreement provisions governing the procedure for changing the Basic Agreement). These changes, however, dealt only with the *notification* provisions, not the *arbitration* provisions. The Memorandum provides in relevant part:

> 4. *Changes in Agreement*
> Sections 600 and 601 shall be amended to read as follows:
> This Agreement and the provisions hereof shall continue in force and be binding upon the respective parties hereto until and including the thirty-first day of December, 1980, and from year to year thereafter, unless changed by the parties. Either of the parties desiring a change in any section or sections of this Agreement shall notify the other party, in writing, that it desires a change at least one hundred and eighty (180) days prior to the thirty-first day of December, 1980, and thereafter, at least one hundred and eighty (180) days prior to the end of each year, which is the thirty-first day of December.
> Such notification shall include, in writing, all the specific changes desired of either party. Within ten (10) days of the receipt of notification of desired changes, representatives of the parties shall commence negotiations in an effort to reach a mutual agreement upon the changes desired by the parties.
> Upon failure to reach an agreement on all the changes desired by the parties ninety (90) days prior to the expiration of the Agreement, the parties shall submit the disputed issues to final and binding arbitration as provided for in this Agreement, and they shall forthwith take such steps as will assure that the arbitrator will be selected within sixty (60) days prior to the expiration of the Agreement. Nothing herein shall preclude the parties from continuing to negotiate in an effort to resolve their differences during the period, while the procedures for the establishment of arbitration are in process.

5. Henceforth, unless the context clearly calls for a different reading, references to the "Basic

sought changes. At this point, the legislature, concerned about a possible transit shutdown due to lack of funds, enacted another statute, Chapter 581 of the Acts of 1980. That statute also sought to hold down costs by imposing additional conditions upon the arbitration (and collective bargaining) procedures. The parties immediately reiterated the positions they had taken in 1978. The Transit Union claimed that both Chapters 405 and 581 were illegal and that arbitration must take place in accordance with the Basic Agreement's specified procedure. The MBTA refused to arbitrate except in conformity with Chapters 405 and 581.

The major differences between the two sets of procedures are the following: the Basic Agreement procedure, as previously mentioned, involves three arbitrators. The Transit Union and the MBTA each select one arbitrator. The third, selected by the other two, is to be a person experienced in transportation matters. The arbitration standards used, while unspecified in the Basic Agreement, are presumably those traditionally used in local transit interest arbitration.[6]

By contrast, the 1978 Chapter 405 procedure requires (1) that mediation precede arbitration,[7] (2) that a single arbitrator who is a resident of Massachusetts and "experienced in state and local finance," conduct the arbitration,[8] (3) that the arbitrator "rely primarily" on nine statutory factors, including "the financial ability of the authority to meet additional costs," and wages, hours and working conditions of comparable Massachusetts employees,[9] (4) that the arbitrator issue a written opinion analyzing the

---

Agreement" should be read to mean the "Basic Agreement (as amended)."

**6.** "The standards used by [interests] arbitrators are not pulled out of the air—nor are they artificially created. They are, generally speaking, the very same ones that are used by the parties in their negotiations. . . .

Without question the most extensively used standard in "interests" arbitration is prevailing practice. . . ."
F. Elkouri & E. Elkouri, *supra* note 3, at 745, 746, 747.

Both the "national comparable cities" standard and area comparisons have been used in the local transit industry. *Id.* at 751 n.20.

**7.** Codified at Mass.Gen.Laws Ann. ch. 161A, § 19D (cum.supp.1981).

**8.** Codified at Mass.Gen.Laws Ann. ch. 161A, § 19E (cum.supp.1981).

**9.** Mass.Gen.Laws Ann. ch. 161A, § 19F (cum. supp.1980), provided:

The arbitrator shall rely primarily on the following factors in determining the basis for an award:

1. The financial ability of the authority to meet additional costs, which shall include but not be limited to:

a. the statutory requirement of advisory board approval of the authority's fiscal budget;

b. the financial ability of the individual communities and the commonwealth to meet additional costs;

c. the average per capita tax burden, average annual income and sources of revenue within the commonwealth, and the effect of any arbitration award on the respective property tax rates of the cities and towns within the authority's district.

2. The overall compensation presently received by the employees, having regard not only for wages for time actually worked but also for wages for time not worked, including vacations, holidays and other excused time.

3. All benefits received by the employees, including insurance, pension, as well as the continuity and stability of employment.

4. The hazards of employment, physical, educational and mental qualifications, job training and skills involved.

5. A comparison of wages, hours, and conditions of employment of the employees involved in the arbitration proceedings with the wages, hours and conditions of employment of other employees performing similar services within the commonwealth and with other employees generally in public and private employment within the commonwealth.

6. The average consumer price for goods and services, commonly known as the cost of living.

7. Changes in any of the foregoing circumstances during the pendency of the arbitration proceedings.

8. Such other factors, not confined to the foregoing, which are normally or traditionally taken into consideration in the determination of wages, hours and conditions of employment through voluntary collective bargaining, mediation, factfinding, arbitration or otherwise between parties, in the public service of the commonwealth.

9. The stipulation of the parties.
Paragraph 8 was subsequently amended in 1980 by ch. 581. *See* note 14, *infra.*

application of the statutory factors,[10] and (5) that the arbitrator disallow any provision for cost of living adjustments after the expiration of a contract period.[11] Chapter 581,[12] enacted at the end of 1980, forbids the MBTA to bargain collectively or agree with the Transit Union about "inherent management rights." These rights are defined to include the right to hire, promote, assign, direct and discharge employees,[13] to direct and control programs and departments, to determine staffing levels, to assign overtime, to hire part-time employees, and to decide how to procure goods and services. Chapter 581 also forbids the MBTA to agree to pay pensions that are based upon overtime pay or to provide for automatic cost-of-living adjustments. It removed all of these matters from arbitration.[14]

**10.** Codified at Mass.Gen.Laws Ann. ch. 161A, § 19G (cum.supp.1981).

**11.** Mass.Gen.Laws Ann. ch. 161A, § 19G (cum. supp.1981) provides in relevant part:

The scope of arbitration shall be limited to wages, hours, and conditions of employment and shall not include any provisions for any cost of living adjustments which are based on changes in the Consumer Price Index after the expiration of the contract period covered by the award. In addition, any wage or salary adjustments shall be expressed in per cent or dollar amounts, and in no case shall there be any provisions for salary adjustments to occur after the expiration of the contract period covered by the award.

**12.** Codified at Mass.Gen.Laws Ann. ch. 161A, § 19 (cum.supp.1981). *See* note 14, *infra.*

**13.** The MBTA states in its brief on appeal that its employees may be discharged "for cause" and notes that § 102 of the 1973 Basic Agreement provides that "[t]he Authority will exercise the exclusive right to ... discharge its employees for cause."

**14.** As codified at Mass.Gen.Laws Ann. ch. 161A, § 19 (cum.supp.1981), ch. 581 provides:

The directors shall have authority to bargain collectively with labor organizations representing employees of the authority and to enter into agreements, with such organizations relative to wages, salaries, hours, working conditions, health benefits, pensions and retirement allowances of such employees; provided, however, that the directors shall have no authority to bargain collectively and shall have no authority to enter into collective bargaining agreements with respect to matters of inherent management right which shall include the right:

(*i*) to direct, appoint, employ, assign and promote officers, agents and employees and to determine the standards therefor.

(*ii*)(A) to discharge and terminate employees subject to the provisions of such clauses (B) and (C).

(B) No action set forth in (A) shall be sustained if, in a proceeding invoked in accordance with the provisions of such clause (C), the employee shall establish by a preponderance of the evidence that it was based upon race, color, religion, sex, age, national origin, handicapping condition, marital status, or political affiliation or activities or union activities or union organizing of the employees; a reprisal against the employee for disclosure of information by an employee which the employee reasonably believes evidences a violation of any law, rule or regulation or mismanagement, a gross waste of funds, or abuse of authority; a reprisal against any employee for the refusal of any person to engage in political activity.

(C) The parties may include in any written agreement a grievance procedure culminating in final and binding arbitration which may be invoked in the event any employee of the authority is aggrieved by any action taken under such clause (A).

(*iii*) to plan and determine the levels of service provided by the authority.

(*iv*) to direct, supervise, control, and evaluate the departments, units, and programs of the authority; to classify the various positions of the authority and ascribe duties and standards of productivity therefor.

(*v*) to develop and determine levels of staffing and training.

(*vi*) to determine whether goods or services should be made, leased, contracted for, or purchased on either a temporary or permanent basis.

(*vii*) to assign and apportion overtime.

(*viii*) to hire part-time employees.

The authority is hereby prohibited from bargaining collectively or entering into any agreement to make pension benefit payments to its employees that are determined in a manner that includes the amount of overtime earnings of said employees.

The authority is hereby prohibited from bargaining collectively or entering into a contract which provides for automatic cost-ofliving salary adjustments which are based on changes in the Consumer Price Index or other similar adjustments unless specifically authorized by law. Except as provided in sections nineteen C to nineteen G, inclusive, the employees of the authority shall submit all grievances and disputes pursuant to arbitration provisions in agreement existing at the

## B

The Transit Union bases its claim that Chapters 405 and 581 are unlawful on two separate constitutional grounds. It makes a conceptually simple "Contract Clause" argument. It claims that the Basic Agreement constitutes a contract with the Commonwealth of Massachusetts. Chapters 405 and 581, in its view, unconstitutionally impair the obligations of that contract.[15] The Union also claims that those chapters violate the Supremacy Clause of the Constitution.[16] It argues that they are inconsistent with assurances that Massachusetts gave the Secretary of Labor under the Urban Mass Transportation Act (UMTA), § 13(c), 49 U.S.C. § 1609(c), and that such assurances, given to a federal official, must prevail, as a constitutional matter, over state law to the contrary. A few additional facts about UMTA will help to clarify this argument.

UMTA provides states with federal money to buy and to improve transit equipment and to supplement the operating revenues of local mass transit systems. In 1964 when Congress enacted this law it included in § 13(c) a requirement that, as a condition of obtaining a grant, the Secretary of Labor certify that "fair and equitable arrangements" have been made "to protect the interests of employees affected" by the federal assistance. It adds that these protective arrangements "shall include ... such provisions as may be necessary for ... preserving rights, privileges and benefits ... under existing collective bargaining agreements," continuing "collective bargaining rights ...," protecting "individual employees against a worsening of their positions with respect to their employment ..." and so on.[17]

In applying this provision, the Department of Labor has encouraged transit au-

---

time of the creation of the authority or subsequently entered into with the authority or, in the absence of such provisions, to the state board of conciliation and arbitration, or other board or body having similar powers and duties. The provisions of general or special laws relative to rates of wages, hours of employment and working conditions of public employees, shall not apply to the authority nor to the employees thereof, but the authority and its employees shall be governed with respect to hours of employment, rates of wages, salaries, hours, working conditions, health benefits, pensions and retirement allowances of its employees by the laws relating to street railway companies.

Chapter 581 also amended ch. 405, Mass.Gen. Laws Ann. ch. 161A, § 19F (cum.supp.1981), so that paragraph 8 of that section now provides that:

[t]he arbitrator shall rely ... on ... [s]uch other factors, not confined to the foregoing, which are normally or traditionally taken into consideration in the determination of wages, hours and conditions of employment through voluntary collective bargaining, mediation, factfinding, arbitration or otherwise between parties, in the public service of the commonwealth, and which are not precluded from bargaining under section nineteen.

15. U.S.Const. art. I, § 10 provides in relevant part: "No State shall ... pass any ... Law impairing the Obligation of the Contracts...."

16. U.S.Const. art. VI, states in relevant part: "the Constitution, and the Laws of the United States which shall be made in Pursuance there-

of ... shall be the Supreme Law of the Land...."

17. Section 13(c) of UMTA, 49 U.S.C. § 1609(c) provides:

(c) it shall be a condition of any assistance under section 1602 of this title that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance. Such protective arrangements shall include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise; (2) the continuation of collective bargaining rights; (3) the protection of individual employees against a worsening of their positions with respect to their employment; (4) assurances of employment to employees of acquired mass transportation systems and priority of reemployment of employees terminated or laid off; and (5) paid training or retraining programs. Such arrangements shall include provisions protecting individual employees against a worsening of their positions with respect to their employment which shall in no event provide benefits less than those established pursuant to section 5(2)(f) of this title. The contract for the granting of any such assistance shall specify the terms and conditions of the protective arrangements.

thorities and unions to submit joint, agreed upon, assurances for review. These assurances are typically referred to as § 13(c) agreements. Over the years, the MBTA and the Transit Union have entered into a series of § 13(c) agreements. The most recent one, entered into on December 10, 1974, has been used repeatedly by the MBTA in grant applications, and by the Department of Labor for certification purposes.

The 1974 § 13(c) agreement includes the following assurances, which are directly relevant here:

a) "All rights, privileges (including pension rights and benefits) of employees ... under the existing collective bargaining agreements or otherwise shall be preserved and continued unless changed ... as provided in said collective bargaining agreements." (§ 3a)

b) "The collective bargaining rights of employees ... including the right to arbitrate labor disputes ..., to the extent such are provided for by applicable laws and/or existing collective bargaining agreements, or otherwise shall be preserved and continued...." (§ 4)

c) "Any ... labor dispute ... shall be referred to arbitration in accordance with the arbitration procedures set forth in any then-applicable collective bargaining agreement.... The term 'labor dispute' ... shall be broadly construed and shall include any controversy concerning

wages, salaries, hours, working conditions or benefits, ... the making or maintaining of collective bargaining agreements, the terms to be included in such agreements...." (§ 13(c)(a)(1)) [18]

Ever since the enactment of Chapter 405, the Transit Union has claimed that the procedure there set out is inconsistent with this set of assurances and that the assurances must prevail over state law to the contrary.

The MBTA not only has denied that these assurances prevail, as a matter of federal law, over inconsistent state law, but also has denied that these assurances are inconsistent with Chapters 405 and 581. In its view the assurances guarantee the union rights only to the extent that those rights are consistent with current state law; the assurances do not protect the union against *changes* in state law. At the urging of the Department of Labor, the parties submitted the question of the meaning of these assurances to an arbitrator. In 1979 that arbitrator, William Fallon, ruled that Chapter 405 "and the MBTA's insistence on arbitrating interest disputes pursuant to those amendments [*i. e.*, Chapter 405] constitute a conflict with pre-existing § 13(c) agreements executed by the parties." He did not determine which should take precedence. The parties continue to dispute whether the § 13(c) assurances are inconsistent with Chapters 405 and 581, and if so, which prevail.[19]

---

18. The 1974 § 13(c) agreement is set out in full in the appendix to the opinion of the district court below, 511 F.Supp. 312, 332–340 (D.Mass.1981).

19. We note that initially the MBTA apparently had power to enter into contracts for federal assistance which would impose regulations or practices in conflict with state law. Mass.Gen. Laws Ann. ch. 161A, § 29 (1976) (enacted in 1964) provided broad authority to waive state law in the face of such a conflict and stated in part:

... It is the intent of this section that the provisions of any federal law, administrative regulation or practice governing federal assistance for the purposes of this chapter shall, to the extent necessary to enable the commonwealth or its subdivisions to receive such assistance and not constitutionally pro-

hibited, override any inconsistent provisions of this chapter.

This broad waiver authority was amended and restricted in 1980 by ch. 581, Mass.Gen. Laws Ann. ch. 161A, § 29 (cum.supp.1981). The language quoted above and other language providing authority to waive state law was repealed. Instead, the legislature provided:

If the provisions of any federal law, administrative regulation, or practice governing federal assistance for the purposes of this chapter are inconsistent with any provisions of this chapter to the extent that the commonwealth or its political subdivisions are prohibited or potentially prohibited from receiving such assistance, the chairman of the authority shall, within thirty days after the federal government has notified him that an inconsistency may exist, notify the governor, and the clerks of the house and senate of such inconsistency.

### C

The parties have brought three separate sets of legal proceedings designed to vindicate their legal positions. First, the MBTA challenged Arbitrator Fallon's award in state court. That proceeding is currently pending in the Supreme Judicial Court.[20] Second, the Transit Union brought a proceeding in the Commonwealth Superior Court to require the MBTA to comply with the Basic Agreement's arbitration procedures despite conflicting state law. The Superior Court enjoined violation of various provisions of the Basic Agreement for six months, but it indicated that (at least for the purposes of injunctive relief) the Basic Agreement may, as a matter of state law, have expired.[21] Finally, the Transit Union brought this action in federal district court, seeking a declaration that Chapters 405 and 581 are unconstitutional, and an injunction requiring the MBTA to arbitrate according to the terms of the Basic Agreement.

On March 17, 1981, the federal district court issued a preliminary injunction. 511 F.Supp. 312 (D.Mass.1981). Focusing on "the central mutual consideration of the [1973 Basic] [A]greement and the core of the parties' reasonable expectations," 511 F.Supp. at 317, it held that *portions* of Chapters 405 and 581 violated the Contract Clause of the federal constitution. It found that the remainder of those chapters did not violate the § 13(c) agreement, for it interpreted that agreement as guaranteeing rights only insofar as they are consistent with current state law. It then ordered the parties to arbitrate under a procedure which the court itself created. The court modified the Basic Agreement to incorporate parts of Chapter 405 that it believed were constitutional.[22] The court issued a clarifying order on May 15, 1981.[23] Both sides have appealed this district court decision. The Transit Union claims that the Basic Agreement's provision must be enforced as written. The MBTA claims that Chapters 405 and 581 are constitutional and govern.

### D

The basic legal issues before us on appeal, then, are two. First, do portions of Chap-

---

**20.** The suit in the Supreme Judicial Court of Massachusetts is a declaratory action pursuant to Mass.Gen.Laws Ann. ch. 231A, seeking a declaration that, *inter alia*, ch. 405 violated the § 13(c) agreement, that the arbitrator exceeded his powers in issuing the award, that the arbitrator's award constituted an unauthorized interpretation of state law, and that the award should be vacated.

The Transit Union removed the state action to federal court, 28 U.S.C. § 1441(b); however, it was remanded to the state court for lack of subject matter jurisdiction. *Adams v. Massachusetts Bay Transportation Authority*, 79–2059–S (D.Mass. December 24, 1980).

**21.** In Superior Court the Transit Union sought to enforce those provisions of the Basic Agreement that rolled over under §§ 600 and 601 against ch. 581. The Superior Court action was brought not only by the Transit Union, but also by Lodge 264 of District 38 of the International Association of Machinists and Aerospace Workers and other unions who sought to enforce alleged rights under their respective contracts. *See Gallahue v. MBTA*, Mass. Superior Court, Suffolk County, No. 45917, slip op. at n.1 (January 7, 1981). For purposes of injunctive relief, the Superior Court enjoined violation of various portions of Lodge 264's collective bargaining agreement until March 2, 1981.

**22.** Essentially, the district court ruled that ch. 405 violates the Contract Clause only insofar as it imposed arbitration by a single arbitrator in place of tripartite arbitration. 511 F.Supp. at 317. The court directed that binding interest arbitration be conducted in accordance with ch. 405, "except that three arbitrators shall be chosen as provided in the collective bargaining agreements and the third or neutral arbitrator shall be (1) experienced in transportation, (2) a legal resident of the Commonwealth of Massachusetts, and (3) experienced in state and local finances." 511 F.Supp. at 318.

With respect to Chapter 581, the district court stated that it violated the Contract Clause "[t]o the extent that ... [it] ... withdraws questions of substance from collective bargaining ...." 511 F.Supp. at 318. The court further held that "Chapter 581 is not applicable, because it conflicts with the essential provisions of a prior agreement, and its applicability is interdicted by Article I, Section 10, of the United States Constitution [the Contract Clause]." *Id.* at 319.

**23.** *See* notes 49 and 57, *infra*. In its memorandum of May 15 the district court ruled, *inter alia*, that §§ 8 and 9 of ch. 581 are in conflict with paragraph 4 of the 1974 § 13(c) agreement, and thus with the Supremacy Clause.

ters 405 and 581 violate the Supremacy Clause? Do they conflict with the § 13(c) assurances, and, if so, do the § 13(c) assurances prevail? Second, do portions of Chapters 405 and 581 unconstitutionally "impair" the obligations of a prior contract? We must also consider a further and totally different issue arising out of a separate claim made by Lodge 264 of District 38 of the International Association of Machinists and Aerospace Workers ("the Machinists").[24] This separate matter will be considered in Part IV of this opinion.

## II

■ We first consider the Transit Union's claim that Chapters 405 and 581 are unconstitutional under the Supremacy Clause because they conflict with the 1974 § 13(c) agreement. The district court held that no such conflict exists, but here we shall assume the contrary. For one thing, an arbitrator, appointed under the terms of the 1974 Agreement has found that a conflict exists. For another thing, the plain language of the § 13(c) agreement quoted above appears to conflict with the two state chapters. Section 4 of the § 13(c) agreement, for example, states that arbitration rights are protected to the extent they are provided for by "applicable laws and/or existing collective bargaining agreements." Yet, the arbitration procedure set forth in Chapter 405 is arguably less favorable to the union than that contained in the "existing" (1973) "collective bargaining agreement." The district court read the language of § 4 to mean that it protected arbitration rights only insofar as those rights were also protected by "applicable law." 511 F.Supp. at 318–319. But the words "and/or" commonly mean "the one or the other or both." And thus § 4 would seem to protect arbitration rights provided by the 1973 "collective bargaining agreement" even if those rights are not provided for by "applicable law." We believe it reasonable for purposes of this opinion to assume that there is a conflict between state law and federal assurance.

■ The more difficult question is, in case of conflict, which prevails, federal assurance or state law? This is a question of congressional intent. Barring some constitutional restraint, Congress plainly has the power to enact a law forbidding states that accept federal money from passing laws inconsistent with a federal statute, inconsistent with regulations made pursuant to the statute, or inconsistent with assurances made pursuant to the statute or those regulations. *E. g., King v. Smith*, 392 U.S. 309, 333 n. 34, 88 S.Ct. 2128, 2141, 20 L.Ed.2d 1118 (1968). The issue here, therefore, is whether Congress intended § 13(c), or, to be more specific whether it intended assurances made pursuant to § 13(c), to override conflicting state law. If not, state law governs—although the federal statutory scheme may provide other remedies for violation of an assurance.

■ The language of the statute does not itself answer the relevant question. It simply provides that "[i]t shall be a condition of assistance ... that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance." And, it goes on to list certain matters that the "protective arrangements" shall include. 49 U.S.C. § 1609(c). It would be consistent with this language that "arrangements" approved by the Secretary automatically invalidate conflicting state law. It is equally consistent with this language that such "arrangements" do not invalidate state law, but that a state with laws that prevent the making of "fair and equitable arrangements," cannot obtain or retain federal assistance. To decide the Supremacy Clause question, we have examined the UMTA statutory scheme in light of its legislative history and prior to case law. Our examination convinces us that Congress intended state law, not § 13(c) assurances, to prevail in case of a conflict. We base this

---

24. The Machinists claim that their (separate) collective bargaining agreement prohibits the MBTA from laying off their members. The

district court enjoined the proposed layoffs and the MBTA appeals.

conclusion upon express language contained in the legislative history, upon the fact that a contrary holding risks distorting UMTA's basic purposes, and upon the practical difficulties that would accompany a contrary result.

## A

We have examined the statute's legislative history with care. In doing so, we are mindful that the courts ought not to void state statutes—particularly those dealing with local economic matters—in the absence of a clear congressional intent to preempt them:

> If Congress is authorized to act in a field, it should manifest its intention clearly. It will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of the intention to do so. The exercise of federal supremacy is not lightly to be presumed.

*Schwartz v. Texas,* 344 U.S. 199, 202–203, 73 S.Ct. 232, 234–35, 97 L.Ed. 231 (1952). *See New York Department of Social Services v. Dublino,* 413 U.S. 405, 413, 93 S.Ct. 2507, 37 L.Ed.2d 668 (1973); *cf. National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). A careful examination of the legislative history reveals no evidence of any intent that a § 13(c) assurance supersedes state law; rather, that history reveals the contrary.

1. The first UMTA bills, introduced in Congress in the early 1960's contained no labor protection provisions. Those provisions, which later became § 13(c), appeared in Congress when Secretary of Labor Willard Wirtz presented them to the Senate and House Committees on Banking and Currency in 1963. Secretary Wirtz first pointed out that the Labor Department had drafted the provisions after discussions with the Amalgamated Transit Union and the AFL–CIO. The unions argued that labor protection was needed for two reasons. UMTA money might be used by the states to buy existing private transit companies.[25] Under the law in some states if a private transit system became publicly owned, its workers would lose their rights to strike and to bargain collectively.[26] UMTA funds might also be used for automation leading to a loss of jobs.[27] Thus, as Secretary Wirtz explained it, § 13(c) was to provide "transitional" protection.[28]

Second, Secretary Wirtz explained how the labor protection provisions work. He made clear that the provisions would give the Labor Department a weapon—in the form of UMTA grants—that could be used to encourage states to modify laws to allow, for example, collective bargaining, or to look for ways around existing anti-union statutes.[29] If a state could not satisfy the Secretary that it had found some lawful method to provide the protection that § 13(c) required, the Secretary would prevent the state from receiving UMTA assistance. Thus, Secretary Wirtz testified that § 13(c) would "affect" state law, but it would not "override" state law.[30]

Third, the Secretary emphasized the breadth of the discretionary power that § 13(c) gave to the Labor Department and the "flexibility" with which that discretion

25. *See* H.R.Rep.No.204, 88th Cong., 2d Sess. 4, *reprinted in* [1964] U.S.Code Cong. & Ad.News 2569, 2583; [hereinafter *House Report*]; S.Rep.No.82, 88th Cong., 1st Sess. 29 (1963) [hereinafter *Senate Report*].

26. During the hearings on UMTA, labor officials pointed to Dade County, Florida as an illustration of a situation where employees of a privately operated transit system lost their collective bargaining rights when the county took over the operation of the system. *See Urban Mass Transportation—1963: Hearings on S.6 and S.917 Before the Subcomm. of the Senate Comm. on Banking and Currency,* 88th Cong., 1st Sess. 324, 325 (1963) [hereinafter *Senate Hearings*] (statement of Bernard Cushman); *Urban Mass Transportation Act of 1963: Hearings on H.R. 3881 Before the House Comm. on Banking and Currency,* 88th Cong., 1st Sess. 487 (1963) [hereinafter *House Hearings*] (statement of Andrew J. Bielmiller).

27. *See* authorities cited at note 25, *supra.*

28. *Senate Hearings, supra* note 26, at 308.

29. *See* note 34, *infra.*

30. *Senate Hearings, supra* note 26, at 312–313.

must be exercised.[31] Thus, he told the House Committee that the Labor Department had the need for "flexibility" in mind "when the standards in the proposal were drafted." [32] The provisions provided flexibility both because the standard used—"fair and equitable arrangements"—was a highly general one and because the statute allowed the Secretary to take "account of the fact that different answers may be appropriate in different cases." [33] Indeed, in response to questioning, the Secretary stated that the provision did not even require him to withhold funds from a state with a law prohibiting collective bargaining among municipal employees. Even in such a case he would search for ways to work out arrangements that would allow the state to participate in the program.[34]

Fourth, the Secretary specifically focused upon the question of whether § 13(c) assurances would supersede state law. In response to questioning in the Senate, he said, "I should like it quite clear that I think that there should be no superseding here of the State law." [35] The Senate Committee report on the bill subsequently stated,

. In regard to the question as to whether these [§ 13(c)] provisions would supersede State labor laws, the committee concurs in a statement made by the Secretary of Labor "that there could be no superseding of State laws by a provision of this kind." [36]

The Secretary also responded to a question by a Congressman about the relation of § 13(c) to state law by saying that the Labor Department's proposal "is submitted on this basis ... that the state laws must control." [37] When questioned by Congressman Wilson about whether he anticipated the "need for changes in any State laws in order to qualify any authority for funds under the provisions of the amendment," Secretary Wirtz responded:

We are not relying upon any such changes, or assuming any such changes. *We are also assuming that the State laws would be controlling in the situation.* But, on the constructive side of my answer, it is also a responsible determination in the light of experience that there would be few, if any, situations, in which the interests of a community in this program where State laws are applicable and practices applicable to collective bargaining would enter and the interests reflected in this proposed amendment could not and would not be reconciled affirmatively. It would be possible in our judgment to take care of that. (Emphasis added.) [38]

In sum, as seen by the Secretary of the Department that drafted § 13(c) (as well as by the Senate Committee that reported it), that section, together with UMTA funds, provided the Department with strong, flexible and discretionary power to encourage states to modify or to find ways around state laws or practices that, for example, inhibited collective bargaining. That section, in their view, clearly did not give the Secretary the power to override state law.

2. On the floor of the Senate, Senator Williams, one of the bill's chief sponsors, Senator Sparkman, the Chairman of the relevant subcommittee, and Senator Morse, a leading advocate of labor protection, all stated that § 13(c) was not intended to override state law. The reason for this unusual degree of explicitness is that two senators—Tower and Goldwater—claimed the contrary and sought to eliminate or to modify that section. Senator Tower based his claim upon the fact that Senate Committee had struck out a proviso that would have allowed the "encouragement of collective bargaining rights to the extent not

31. *House Hearings, supra* note 26, at 482.

32. *Id.*

33. *Id.*

34. *House Hearings, supra* note 26, at 482–483, 484–485.

35. *Senate Hearings, supra* note 26, at 313.

36. *Senate Report, supra* note 25, at 29.

37. *House Hearings, supra* note 26, at 482.

38. *Id.* at 486.

inconsistent with state law." 109 Cong.Rec. 5322, 5415 (1963).[39] He was joined by Senator Goldwater (who also sought to strike out § 13(c)).[40] Senator Williams responded to their argument by stating:

This provision [*i.e.*, § 13(c)] is truly ancillary to the thrust of the transportation program. It is only included in the interest of fairness and equity. If as a result of the expenditure of federal funds, a railroad employee having a lifetime of contributions to a pension system were to lose it because his railroad was taken over by the public, that would be grossly unfair. This provision protects those rights

---

**39.** Senator Tower stated:

Another matter relating to the labor section is extremely important. A number of States have, in one form or another, restrictions prohibiting certain labor activities by employees of the State and its political subdivisions. Would Federal assistance be given to States whose labor laws conflict with the labor provisions in this bill? Would the labor provisions in this bill supersede the laws of the various States? The Secretary of Labor indicated there would be no superseding of State law but said the question of whether there would be an effect was a somewhat different question. However, in section 10(c)(2) of the bill, in the language referring to the enforcement of the prevention of curtailment of collective bargaining rights ... the words "to the extent not inconsistent with State or local law"—approved in subcommittee—were deleted from the bill in full committee. From this, one can only assume that this measure could be enforced in a manner not consistent with State or local law....

Secretary Wirtz, in referring in his testimony to the situation in Dade County—where as I have mentioned, there was a loss of collective-bargaining rights, due to the establishment of a new transit system operated by the municipality—said that in the application of Senate bill 6 to situations of that kind:

There would be a question that would have to be squarely faced, as to whether or not Federal fund should be used in connection with a situation of that kind, unless better arrangements could be worked out for the preservation of collective bargaining rights.

Will State laws be superseded, if not in one way, in another? The question is certainly raised as to whether the Administrator will be forced to deny assistance to certain States. Or would he deny assistance to certain states only until they changed their laws? The point is not at all clear, because no testimony was made available to the com-

---

which have been hard earned and enables them to continue.

*The legislative history has to be corrected, however, because if the bill shall be enacted, we must have a record that will show that the bill does not preempt State law; it does not control or dominate with irrevocable authority local situations.* The bill provides for the encouragement of collective bargaining. That does not put the force of a mandate on a community.... I do not believe we can pass a law which would change State law; and we do not attempt to do so....

mittee after the deletion of the words "not inconsistent with State or local law."
109 Cong.Rec. 5322.

**40.** Senator Goldwater remarked with respect to § 13(c) (also designated as § 10(c) or § 19(c) in various bills):

The enactment of this provision would represent a complete reversal of the public policy of the United States, which for over a quarter of a century, as enunciated in the Wagner Act and the Taft-Hartley Act, has specifically excluded by definition, any State or political subdivision thereof from all obligations imposed by the Federal Labor-Management Relations Act, including the requirement to bargain collectively with representatives of its employees. Both the Wagner Act and the Taft-Hartley Act have long recognized the right of the States, local governments, and communities to regulate and manage their affairs and their arrangements with their employees free from Federal interference and control.

I might say in this connection, Mr. President, that many States have laws which prevent bargaining with unions in the area of public employment. This section of the bill would preempt such laws and such ordinances as passed pertinent thereto by the local authorities.

*       *       *       *       *       *

If this language remains in the bill, I am afraid we shall again be preempting established State laws, city ordinances, county ordinances or laws, whichever pertain.

As I said a moment ago, if the local government wishes to extend the collective bargaining rights, wages, working conditions, and so forth, with no right to strike, that is up to the local government, be it city, county or State; but if the United States moved in with the language contained in subsection (c) of section 19, it would have the effect, I believe, of preempting State law in this area.
109 Cong.Rec. 5415.

*Id.* at 5417. (Emphasis added.) [41] Senator Sparkman added a similar view, *id.* at 5418,[42] and the effort to strike the section was defeated. *Id.* at 5420.

41. Following Senator Williams' statement, this exchange ensued:

Mr. MILLER. Is it the intention, so far as the Senator from New Jersey and the committee are concerned, to the best of the Senator's knowledge, that the provision which is the subject of the amendment of the Senator from Arizona shall not be inconsistent with State law?

Mr. WILLIAMS of New Jersey. Is that another way of saying that it cannot preempt or be a substitute for State law?

Mr. MILLER. I should think so.

Mr. WILLIAMS of New Jersey. That is my answer. It was the same answer the Secretary of Labor gave to the committee.

Mr. TOWER. Mr. President, will the Senator from Arizona yield, that I may propound a further question to the Senator from New Jersey.

Mr. GOLDWATER. I yield for that purpose.

Mr. TOWER. If that is the case, why did we strike from the bill, reported by the Committee on Commerce, on page 26, line 17, the collective bargaining section: "to the extent not inconsistent with State or local law"?

If it is our intent not to be inconsistent with State or local law, why was that provision deleted?

Mr. WILLIAMS of New Jersey. The answer is very simple. The provision should not have been included in the first place. If we had not made a mistake in the first place by doing what was unnecessary, it would not have been necessary to delete that provision.

Mr. TOWER. I still do not understand the point in taking it out if, as the Senator has said, it is not the intent to be inconsistent with State law.

Mr. WILLIAMS of New Jersey. Must we, in every paragraph of every bill, say, "The action under the authority of this legislation shall be in conformity with the Constitution of the United States"?

Mr. TOWER. What reflects legislative intent more clearly than the language which was deleted from the bill?

Mr. WILLIAMS of New Jersey. I am sure the Senator knows that if one makes a mistake, he should not try to preserve it. In our legislative history, shall we magnify a mistake which we made together?

109 Cong.Rec. 5417–5418.

42. Senator Sparkman's remarks, and the reactions of Senators Goldwater and Tower were recorded as follows:

Mr. SPARKMAN.... I know that the language was written. It was done clearly with the idea that while there would be an encouragement of a continuation of collective bargaining rights, it was not intended to supersede State laws. I believe the questioning of the Secretary of Labor indicates our concern about that. It was not our intention to supersede State laws, and we do not intend, I am sure, to do so. We do not believe that the language has that effect.

Mr. GOLDWATER. If we are to depend on the Secretary's testimony for legislative history, neither side has much of a leg to stand on, because this language is about as fuzzy-wuzzy as any I have ever tried to read. It reads like some of the texts on proper punctuation, because when one gets through reading it, it is just a lot of language.

Mr. TOWER. Actually, the Secretary was testifying on the basis of the language he submitted to the committee, not the language which was finally provided in the bill.

Mr. SPARKMAN. That is correct.

Mr. President, will the Senator from Arizona yield further?

Mr. GOLDWATER. I yield.

Mr. SPARKMAN. I admit that in reading the Secretary's answer, there is a chance of someone's misunderstanding it. But if the entire statement is read, I think we find that he clearly said it will not supersede State laws.

He was asked, "Does it affect them?" He replied, "That is different"—and it is. If it has any effect whatever on them, that would be covered by the word "effect." I think the Secretary was splitting hairs when he tried to make that distinction. Of course it might have an effect upon State laws, but even in that connection he repeated his statement that it will not supersede or displace or override them.

Mr. GOLDWATER. Let me read what Secretary Wirtz said, as it appears on page 313. His statement was made in answer to a question by the Senator from Texas [Mr. Tower]:

But I should like it quite clear that I think that there could be no superseding here of the State law.

But that is not a statement on which one could rely with any conviction. He merely said he thought there could be no superseding of State law....

Mr. SPARKMAN. Let me point out that at another place Secretary Wirtz said "surely" this amendment would not supersede State laws.

Mr. GOLDWATER. On what page is that statement to be found?

Mr. SPARKMAN. On page 312, near the bottom.

Mr. GOLDWATER. But he added "to the best of my knowledge."

109 Cong.Rec. 5418.

Senator Tower then sought to amend § 13(c) to require only arrangements "consistent with the laws of the State in which the project is located." *Id.* at 5421. Again, he argued that without this proviso § 13(c) might override state law. The amendment was defeated, in part, because, as Senator Williams stated again and again, it was unnecessary: § 13(c) did not superseded state law. *Id.*[43] The real issue at stake, however, was not the question of override; the real issue was whether the Secretary of Labor would have the power to use § 13(c) as a weapon to encourage states to modify anti-union laws or to look for ways around those laws in the case of municipal transit workers (particularly those "acquired" from private companies with UMTA funds). Senator Tower's amendment would have severely limited the Secretary's power to insist upon changes in state law as a condition for receiving funds—the very power that Secretary Wirtz had sought. The defeat of that amendment allowed him that power. Senator Javits explained the matter clearly:

> The reason I oppose the amendment is that I believe the provisions with respect to labor are in balance now, so far as Senators like myself are concerned. I should like to state my understanding of the situation and why I believe the amendment will complicate it rather than improve it.
>
> My understanding of the amendment is that the Secretary of Labor, under the bill, cannot supersede State law. If State law makes it impossible for the employees of municipal transit systems to bargain collectively, then it makes it impossible. There is nothing in the bill that can override it. Indeed, I doubt that the Constitution will permit it, and I doubt that it can be done under any phase of the Taft-Hartley law.

However, what it does, by not mentioning the proposition is to enable the Secretary of Labor ..., to go into a State where a right-to-work law or some other law deprives the municipal employees—that is, employees of the transit system—of collective bargaining rights. Perhaps because the Administrator has money to give out, some States may be induced to make some accommodation on that score by the necessary exemption from the law or any interstate compact entered into with other States.

> Therefore, we have a balanced scheme. We do not override the law; at the same time, we do not compel the Federal Government to go in where the law is adverse to the interest of labor and labor's own point of view, and perhaps also even give encouragement to exempt a situation of this kind where the State desires to get this type of Federal help.
>
> I think that is giving something on both sides, while at the same time not giving the Administrator instructions, which is what the amendment would do, that he must go into such States notwithstanding the fact that the municipal transit system workers might be deprived of collective bargaining rights.
>
> Therefore, I believe the amendment should be rejected.

109 Cong.Rec. 5422 (1963).

Subsequently, Senator Morse, a strong supporter of labor protection, added that under § 13(c), "The state can continue its state policy if it wishes to; but ... the State should not be allowed to receive Federal money with which to continue a policy that is in conflict with sound Federal policy." *Id.* at 5672. He added that the final § 13(c) provision "does not supersede any State policy." *Id.* at 5673.

Thus, the Senate debate reveals not a single senator who intended § 13(c) to override conflicting state law. It contains ex-

---

**43.** Senator Williams also stated:

To provide specifically that the rights could not be inconsistent with State law would be to imply that without such language there is the possibility of the program being inconsistent with State law which we know is not

the fact. If the language is put in, it seems to me, while it might seem a small matter in respect to this bill, it would set a precedent for other legislation, which I think would be dangerous.

*Id.* at 5423.

plicit statements by sponsoring senators that they intended the contrary and believed that § 13(c) carries out their intent. The senatorial remarks to the contrary are not supported by legal argument and were made by senators as part of an argument for an amendment that went well beyond removing any direct conflict between § 13(c) and state law.

3. The Senate debate was repeated in the House of Representatives. Some congressmen articulated fears similar to those of Senators Tower and Goldwater. They feared that the legislation would override state law. *See, e.g.,* 110 Cong.Rec. 14979 (remarks of Rep. Taft). The bill's sponsors, however, assured the House that § 13(c) was not intended to override conflicting state law. Thus, Congressman Multer stated that "[n]othing in this bill and nothing in any amendment thus far adopted will infringe upon local law whether it be of a State or municipality." *Id.* at 14980. And, Congressman Rains argued "that there is not one line in this bill that would vitiate in any way any State or local law . . . ." *Id.*

In sum, the legislative history reveals one explicit statement after another, made by the bill's drafters, the bill's sponsors in the Senate, and those who sponsored it in the House, that § 13(c), while designed to prod the states, is not intended to lead to the invalidation of any state law.

### B

It might be argued, however, that this legislative history does not dispose of the matter because it does not explicitly consider the effect of § 13(c) on new state law enacted *after* the state has accepted UMTA funds. Indeed, the union here does not argue that § 13(c) assurances override pre-existing state law; it claims they override subsequently enacted state law. We do not believe, however, that this distinction is determinative for the following reasons.

First, there is nothing in the legislative history of UMTA suggesting a need to draw this distinction. Rather, the history quoted above suggests that the senators and congressmen who drafted, sponsored,

and voted for the bill believed that § 13(c) would not override *any* state law. And, there is no indication at all that both the statute *and* the detailed assurances given pursuant to § 13(c) were intended to predominate in case of conflict.

Second, if as the Transit Union contends, § 13(c) assurances override state law, Congress, in enacting § 13(c), to a significant extent federalized collective bargaining with local transit unions. Section 13(c) assurances consist of detailed documents, negotiated between transit authority and union, containing hosts of conditions related to wages, hours and working conditions—conditions that could govern the relations between the parties for years to come. To give these documents the authority of federal law overriding state law to the contrary would transfer predominate legal authority for local transit labor relations from state to federal government. The statute would have created a federal involvement in local transit labor relations akin to that which now exists with respect to railroad and airline workers. *See generally International Association of Machinists v. Central Airlines, Inc.,* 372 U.S. 682, 687, 83 S.Ct. 956, 959, 10 L.Ed.2d 67 (1963).

Whether or not such a federal presence is desirable, we cannot interpret the ambiguous language of § 13(c) to create it without a fairly clear indication that such was Congress's intent. Unlike railway and airline workers, we are here considering workers for *local* transit companies whose employers, by and large, are municipalities or state governments. *Cf. National League of Cities v. Usery, supra.* Moreover, in the National Labor Relations Act Congress explicitly exempted public employees, such as MBTA workers, from federal labor legislation. *See Local Division 589, Amalgamated Transit Union v. Amalgamated Transit Union,* 295 F.Supp. 630, 632 (D.Mass.1969). Had Congress intended to grant the Secretary of Labor NLRB-type (or more) power to override state law governing these local public employees, one would expect to find some indication that Congress at least thought about the matter. But instead, the

legislative history is silent. Not a word indicates that Congress intended such a result. The unions in 1963 urged no such outcome.[44]

To the contrary, the legislative history suggests that Congress was sensitive to the local nature of local transit; it "expected that specific conditions [in § 13(c) assurances] normally will be the product of local bargaining and negotiations;" *Senate Report, supra* note 25, at 28; *see House Report, supra* note 25, [1964] U.S.Code Cong. & Admin.News at 2584–2585;[45] and its members made the many statements previously discussed suggesting the legal supremacy of state law.

Third, § 13(c)'s framers intended a limited set of provisional protections. Secretary Wirtz testified that "we are concerned particularly only about the *transitional* effects upon particular employee groups . . . [caused by] consolidation, merger, acquisition of various lines or the establishment of new systems beside or in some cases replacing old systems [or by the] establishment or programs of technological improvement." *Senate Hearings, supra* note 26, at 308 (emphasis added). To erect upon § 13(c) assurances a near permanent set of specific collective bargaining conditions which the state cannot change is to go beyond this limited purpose.

Fourth, to find that specific § 13(c) assurances override state law would also go beyond § 13(c)'s objective of assuring "fair and equitable" arrangements. Clearly, a state law could modify a particular § 13(c) assurance without inevitably bringing about an unfair or inequitable result. It has not been shown, for example, that the new system provided by Chapters 405 and 581 is basically unfair or inequitable; it is simply claimed that those chapters change the 1973 Basic Agreement permanently frozen in detail by the 1974 assurances. Congress's general intent to secure fair arrangements does not require the implementation of any *particular* set of detailed provisions. Indeed, if the specific detailed provisions of a § 13(c) assurance prevail over *any* conflicting change in state law, the Secretary of Labor would lose any ongoing power to exercise discretion—to decide whether or not a change makes the state system as a whole unfair to the transit workers. This result would be anomalous given a legislative history stressing the need for flexibility and discretion. *See* note 34, *supra. See also Kendler v. Wirtz*, 388 F.2d 381, 383 (3d Cir. 1968); *City of Macon v. Marshall*, 439 F.Supp. 1209, 1223–1224 (M.D.Ga.1977).

Fifth, § 13(c) assurances need not override state law to make § 13(c) enforceable. The threat of receiving no further UMTA funds would often prevent a state currently receiving those funds from changing its laws contrary to the policy of § 13(c). If not, the Secretary might halt the flow of funds or take other appropriate action. In any event, such an enforcement scheme is more consistent with congressional intent than the alternative urged upon us by the Transit Union; namely, that § 13(c) permanently binds states to the details of § 13(c)

---

**44.** Indeed, the prime concern advanced by labor leaders with respect to § 13(c) was that while they agreed with its objectives, it was excessively general. Thus, they proposed a more detailed amendment, which provided, in part, that fair and equitable arrangements "shall be available to all . . . employees and shall not be limited to employees of existing mass transportation systems but shall "include employees employed on any new project, system, line, operation, or facilities. . . ." *House Hearings, supra* note 26, at 494–495 (statement of Andrew J. Bielmiller). In particular, they pressed that a provision be added which would authorize binding arbitration, *id.,* a proposal which was rejected by Congress.

**45.** We note, moreover, that the U. S. Department of Labor has recognized the validity of state law in its implementing regulations. 29 C.F.R. § 215.3(a)(2) (1980) provides:

In instances where state or political subdivisions are subject to legal restrictions on bargaining with employee organizations, the Department of Labor will utilize special procedures to satisfy the Federal statute in a manner which does not contravene state or local law. For example, employee protective terms and conditions, acceptable to both employee and applicant representatives, may be incorporated into a resolution adopted by the involved local government.

assurances and referenced collective bargaining agreements entered into perhaps a decade earlier, regardless of whether changes in state law are, in any overall sense, unfair. Even if such a system is desirable, the legislative history of UMTA suggests that Congress did not intend to create it.

## C

The Transit Union has cited several cases that it believes stand for the proposition that § 13(c) assurances supersede state law. We have found no case, however, which is both directly on point and which considers the issue in detail. The Union cites many cases which deal with *other* federal statutes. These include *International Association of Machinists v. Central Airlines, Inc.*, 372 U.S. at 689–91, 83 S.Ct. at 960–61 (§ 204 of the Railway Act, 45 U.S.C. § 184); *Ivanhoe Irrig. Dist. v. McCracken*, 357 U.S. 275, 291–294, 78 S.Ct. 1174, 1183–1185, 2 L.Ed.2d 1313 (1958) (Reclamation Act of 1902); *International Brotherhood of Teamsters v. Oliver*, 358 U.S. 283, 295–297, 79 S.Ct. 297, 304–305, 3 L.Ed.2d 312 (1959) (§§ 7 and 8 of the National Labor Relations Act, 29 U.S.C. §§ 157 and 158); *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 456–457, (1957) and *Teamsters Local v. Lucas Flour Co.*, 369 U.S. 95, 102–103, 82 S.Ct. 571, 576, 7 L.Ed.2d 593 (1962) (substantive law to be applied in suits under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185). In each of these cases, the Court held that federal law is preemptive. Yet, these cases are not persuasive here where we deal with a different statute, with different statutory objectives, and with a different legislative history.

Most of the UMTA cases cited by the Union do not deal with the precise question here at issue. Thus, in *Local Division 714, Amalgamated Transit Union v. Greater Portland Transit District*, 589 F.2d 1 (1st Cir. 1978), we decided a jurisdictional question. We held only that a union "does have a federal cause of action, implied from UMTA § 13(c) to enforce the labor protective arrangements to which the [Greater Portland Transit] District agreed to as a condition of federal financial assistance under the Act." 589 F.2d at 16. We further noted that future "enforcement litigation will surely involve interpreting the protective arrangements in light of the purposes and policies of § 13(c), as well as resolving issues relating to the interplay between federal and state labor policies and possible supremacy clause problems." *Id.* at 13. We did not decide the question of whether § 13(c) requires that state law be subordinated to § 13(c) assurances. The Transit Union has cited language in that case that might imply such subordination. To the extent that it does so, however, we hereby disapprove it.

Several other cases cited also deal with the same jurisdictional question at issue in *Greater Portland.* Thus, the Sixth Circuit, *Local Division 1285, Amalgamated Transit Union v. Jackson Transit Authority*, 650 F.2d 1379 (6th Cir. 1981); the Seventh Circuit, *Local Division 519, Amalgamated Transit Union v. LaCrosse Municipal Transit Utility*, 585 F.2d 1340 (7th Cir. 1978); and the Eighth Circuit, *Division 1287, Amalgamated Transit Union v. Kansas City Area Transportation Authority*, 582 F.2d 444 (8th Cir. 1978), *cert. denied*, 439 U.S. 1090, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979), also reached the conclusion that a claim of breach of a § 13(c) agreement sets forth a dispute cognizable in federal court;[46] in none of these cases did the court explicitly explore the problem of a conflict with a state law, and in none did the court decide whether, as a·matter of general principle, assurances provided under § 13(c) govern in the face of a conflicting state statute.

We recognize that there are dicta in *Jackson* and *Kansas City Area Transportation Authority* which appear to support the

**46.** Similarly, *see Division 1235, Amalgamated Transit Union v. Metropolitan Transit Authority*, 650 F.2d 1389 (6th Cir. 1981); *Division 1212, Amalgamated Transit Union v. Chattanooga Area Regional Transportation Authority*, 483 F.Supp. 37, 39 (E.D.Tenn.1979).

Transit Union's position.[47]  And, subsequent to the decision of the Eighth Circuit, a district court ruled, in an alternative holding, that where state law and a § 13(c) agreement are in conflict, state law must yield. *Division 1287, Amalgamated Transit Union v. Kansas City Area Transportation Authority*, 485 F.Supp. 856, 863–864 (W.D. Mo.1980).  *But see generally Division 580, Amalgamated Transit Union v. Central New York Regional Transportation Authority*, 556 F.2d 659, 662 (2d Cir. 1977) (suggestive of support for proposition that state law need not yield when in conflict with § 13(c) agreement).  Several unpublished opinions also lend support to the Transit Union's position.  None of these opinions, however, considers the issue in depth, and we have determined not to follow them.

For these reasons, we hold that the specific detailed assurances given by a union and a transit authority to the Labor Department under (UMTA) § 13(c) do not invalidate a state law to the contrary.

### III

■■ The Transit Union also claims that Chapters 405 and 581 are unconstitutional because they impair the obligations of the 1973 Basic Agreement, thereby violating the Contract Clause of the United States Constitution.  ("No State shall ... pass any ... Law impairing the Obligation of Contracts...."  Art. I, § 10.)  The MBTA disputes the district court's holding that portions of Chapter 405 and all of Chapter 581 violate the Contract Clause.  We agree with the MBTA that these chapters do not violate the Clause.

For one thing, the Basic Agreement may well have expired before Chapters 405 and 581 took effect.  Although language in the Agreement appears to extend it indefinitely into the future, a Massachusetts state court recently held that, at least for purposes of injunctive relief, the agreement has terminated.  On January 7, 1981, the Massachusetts Superior Court, per Judge Young, stated that the Transit Union contract (among others) contains:

> language implying that the prior contract provisions remain in effect until a new contract is negotiated.  For injunctive purposes, this Court concludes that it is unreasonable to interpret these provisions

**47.** In *Jackson, supra*, the Sixth Circuit stated:
> It is indisputable that Section 13(c) reflects national labor policy.  *See* 109 Cong. Rec. 5670.  Indeed, the legislative history reveals that several senators were concerned about possible conflicts between Section 13(c) and state law, particularly in the area of the right to strike.  *Id.* at 5672–73.  Senator Morse, the chief sponsor of the bill which became Section 13(c), assured his colleagues that state laws forbidding public employee strikes would supersede national labor policy, but *only* where the right to strike was concerned;  all other collective bargaining rights would be protected.  *Id.* at 5671–73....
> *    *    *    *    *    *
> Jackson points out, correctly, that section 13(c) was designed to encourage flexibility in formulating labor protective "arrangements."  Senator Morse himself suggested that if local law prohibits collective bargaining by municipal employees, alternative solutions such as entrusting management of the transit authority to a private commission which *could* legally bargain with the union might be explored.  *See also* Department of Labor Guidelines, 43 F.R. 13558 (3–31–78).  The point, of course, is not that Congress was willing to make allowances for local problems.  Rather, the point is that to qualify for federal funds, municipalities *must*, one way or another, undertake to protect the collective bargaining rights required by national labor policy.
> 650 F.2d at 1385–1386.
In a similar vein, the Eighth Circuit has stated:
> We recognize that under the laws of some states employees of public agencies are not accorded collective bargaining rights nor do they enjoy the benefits of such bargaining, including arbitration.  We think, however, that when a state or a combination of states forms a public transit agency for the express purpose of obtaining federal money to enable it to take over the business of a private transit company, and where the agency in order to obtain the money enters into a § 13(c) agreement that calls for interest arbitration, the obligation to arbitrate is binding on the agency, regardless of general state law or policy.
*Division 1287 Amalgamated Transit Union v. Kansas City Area Transportation Authority*, 582 F.2d at 452–453.
Because the opinions do not explore the precise nature of the conflict between state statutes and federal assurances, we are uncertain of the extent to which their language directly conflicts with our holding here.

so as to continue the prior provisions forever.... .Accordingly, for purposes of granting injunctive relief, this Court shall set a six month period to injunctive relief granted on the basis of such contracts since this seems a reasonable time within which the parties may renegotiate them. *Gallahue v. MBTA*, Mass. Superior Court, Suffolk County No. 45917, slip op. at n.1 (January 7, 1981).[48] On July 1, 1981, Judge Young denied plaintiffs' motion to extend the injunction, presumably on the ground that the collective bargaining contract was no longer in effect. If Judge Young's opinion constitutes an authoritative interpretation of the Basic Agreement, the Contract Clause would not be violated, for Chapters 405 and 581 apply only to future negotiations,[49] when the Basic Agreement would no longer be in effect. It has been clear since 1827 that the Clause applies only to laws with retrospective, not prospective, effect. *Ogden v. Saunders*, 12 Wheat. 213, 6 L.Ed. 606 (1827). *See also* Schwartz, *Old Wine in Old Bottles: The Renaissance of the Contract Clause*, [1979] Supreme Court Rev. 95, 99.

For another thing, even if the Superior Court's decision is not to be taken as a definite state interpretation of the Basic Agreement, there are strong reasons for believing that the Agreement should be given this interpretation for purposes of applying the federal Contract Clause. Ever since the Charles River Bridge case, it has been the law that public contracts are to be strictly construed in favor of the state. *Charles River Bridge v. Warren Bridge*, 11 Pet. 420, 9 L.Ed. 773 (1837); Schwartz, *supra*, at 99. In holding that a company's charter to operate a toll bridge did not bar the state from authorizing the construction of a competing free bridge, the Supreme Court stated: " '[A]ny ambiguity in the terms of the contracts must operate against the [company] ... and in favor of the public'." 11 Pet. at 543, *quoting Stourbridge Canal v. Wheely*, 2 B & Ad. 793. Similarly, the Court has written:

> Every reasonable doubt is to be resolved adversely [to the private party claiming under the contract]. Nothing is to be taken as conceded but what is given in unmistakable terms or by an implication equally clear. The affirmative must be shown. Silence is negation and doubt is fatal to the claim. This doctrine is vital to the public welfare.

*Fertilizing Co. v. Hyde Park*, 97 U.S. 659, 666, 24 L.Ed. 1036 (1878). This doctrine illustrates the deference that federal courts must pay to state legislation if the Contract Clause is not to become a serious obstacle to the enactment of social or economic legislation that the states believe is necessary.

It is possible to interpret the terms of the Basic Agreement in a way that suggests the Agreement has terminated. Of course, if taken literally, the language of the Agreement would make it perpetual. Sections 600 and 601 of the 1973 Basic Agreement were amended by the Memorandum of Understanding (the 1979 collective bargaining agreement)[50] to provide that the agreement will continue in force until December 31, 1980, "and from year to year thereafter unless changed by the parties." A party desiring change shall give notice, and if no agreement is reached on those proposals, "the parties shall submit the disputed issues to final and binding arbitration as provided for in this Agreement." This language literally requires perpetual use of the 1973 arbitration system. It would prevent either party from *ever* denouncing the Agreement through termination and seeking a totally

---

**48.** *See* note 21 *supra.*

**49.** Defendants have stated that the laws here at issue are designed to apply to MBTA contract negotiations subsequent to their enactment.

The federal district court also suggests in its supplementary memorandum of May 15, 1981, that the Contract Clause problem may no longer exist because the Commonwealth had asserted on May 13, 1981, "that the parties have agreed to terminate the 1973 agreement and write a new one." As the court goes on to note, however, the record is unclear on this point—and the Transit Union has asserted in this court that as far as it is concerned, the collective bargaining agreement remains in effect.

**50.** *See* note 4 *supra.*

new one, no matter how unsatisfactory it found the 1973 arrangement.

It is difficult to believe that the parties to the agreement thought they could bind their successors forever. Perpetual contracts would seem to be particularly inappropriate in the field of labor relations, where fluctuating economic circumstances ordinarily call for the ability to adapt to changes.[51] *See generally* D. Bok and J. Dunlop, Labor and the American Community 289 (1970) (unpredictable nature of long-term agreements). And, it seems unlikely that the parties in 1973 or 1979 believed that they had found a permanent solution to the MBTA's labor/management problems or that they thought they had prevented both the state and the Transit Union from ever again exercising their respective powers to achieve some other accommodation with changing realities. The parties were presumably aware that a perpetual agreement was unlikely to be enforceable at law. Not even in the area of property law—an area where legal relationships are traditionally stable and certain, have the courts allowed private parties to make arrangements lasting in perpetuity. *See* Restatement of the Law of Property § 370 (1944). State courts have interpreted commercial contracts that apparently called for perpetual arrangements, not to do so. *See Simons v. American Dry Ginger Ale Co.*, 335 Mass. 521, 524, 140 N.E.2d 649, 655 (1957). And, where such an interpretation has proved impossible in public collective bargaining agreements, they have struck such provisions down as contrary to public policy. *See, e. g., Niagara Wheatfield Administrators Association v. Niagara Wheatfield Central School District*, 54 A.D.2d 498, 389 N.Y. S.2d 667, 669–670 (4th Dept. 1976). Massachusetts courts have recognized the particularly strong public interest at stake where government labor contracts are at issue; and, they have indicated their willingness to strike down or interpret away provisions in such contracts that run contrary to public policy, by, for example, imposing undue re-strictions upon the freedom of action of public authorities. *See School Committee of Boston v. Boston Teachers Union*, 378 Mass. 65, —— – ——, 389 N.E.2d 970, 973–974 (1979); *Watertown Firefighters v. Watertown*, 376 Mass. 706, 713 n.15, 383 N.E.2d 494, 498 n.15 (1978).

Under these circumstances, the fact that the Basic Agreement is silent as to the parties' authority to terminate completely or to denounce the contract (as contrasted with the power to "change" the contract) might well be interpreted to allow them to do. Consistent with the express language, the interest arbitration provision might be interpreted as forbidding total termination of the contract only *for a reasonable time* after expiration of the contract's express term—in this instance December 31, 1980. Under any such interpretation of the contract—similar to that apparently reached by the Massachusetts Superior Court—there is no Contract Clause problem present here.

Nonetheless, it is conceivable that state courts reviewing the Basic Agreement in related cases will reach a different conclusion. Because of the need for expeditious resolution of this litigation, we have also considered the Contract Clause question on the assumption that the "perpetual duration" provisions of the Agreement are to be read literally. In that case, the narrow question before us is whether two subsequently enacted state laws (Chapters 405 and 581) can constitutionally override those provisions of the contract that provide for indefinite (or perpetual) extension (or renewal) of the contract's terms. We believe that they can.

█ The Contract Clause does not make unlawful *every* state law that conflicts with *any* contract that contains terms contrary to its provisions. Any such interpretation would make of the clause an insuperable barrier to necessary state legislation. It would threaten to make the Constitution

---

51. Indeed, other "public employees" in Massachusetts are limited to collective bargaining agreements for a term not to exceed three years. Mass.Gen.Laws.Ann. ch. 150E, § 7 (cum.supp.1981).

unworkable. *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 428, 434–435, 443, 54 S.Ct. 231, 236, 238–239, 242, 78 L.Ed. 413 (1934).[52] As the Supreme Court has stated, "literalism of the construction of the contract clause ... would make it destructive of the public interest by depriving the state of its prerogative of self-protection." *W. B. Worthen Co. v. Thomas*, 292 U.S. 426, 433, 54 S.Ct. 816, 818, 78 L.Ed. 1344 (1934). Thus, the courts have interpreted the clause so as to harmonize the state's need to legislate in the interests of its citizens with the need to protect investors and other contracting parties against repudiation of a debt or obligation. In doing so, at least since the early 1930's, they have struck down state laws only infrequently.[53]

In applying the clause, courts have examined the strength of the relevant interests of the private parties and those of the state. They have considered the nature of the private party's investment, which could take the form of labor as well as capital: to what extent has a party *worsened his pre-existing circumstances* by entering into, and relying upon, the contract? Moreover, the courts have examined the extent to which the party might reasonably have relied upon enforcement of the contractual promise in order to protect his investment. Thus, it is not surprising that the courts have upheld laws where these interests are likely to be weak, such as where a law would have basically prospective application, *Ogden v. Saunders, supra,* or where a retrospective law would modify, not substantive rights, but pre-existing contractual remedies. *Penniman's Case*, 103 U.S. 714, 26 L.Ed. 602 (1881). *See W. B. Worthen Co. v. Kavanaugh*, 295 U.S. 56, 60, 55 S.Ct. 555, 556, 78 L.Ed. 1298 (1935); *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. at 434 n.13, 54 S.Ct. at 238 (collecting "remedy" cases); *Mason v. Haile*, 12 Wheat. 370, 6 L.Ed. 660 (1827). *See also Sturges v. Crowninshield*, 4 Wheat. 122, 200, 201, 4 L.Ed. 529 (1819). As

the Supreme Court recently stated, "a reasonable modification of statutes governing contract remedies is much less likely to upset expectations than a law adjusting the express terms of an agreement." *United States Trust Co. v. New Jersey*, 431 U.S. 1, 20–21 n.17, 97 S.Ct. 1505, 1517, 52 L.Ed.2d 92 (1977).

Courts have also examined the type of legislation at issue to determine the importance and strength of the state's interest in legislating. *See, e.g., Stone v. Mississippi*, 101 U.S. 814, 817–818, 25 L.Ed. 1079 (1880). They have frequently held that contracts are impliedly limited by, and subject to, the implicit authority of the state to exercise its "police power." *E.g., Allied Structural Steel v. Spannaus*, 438 U.S. 234, 241, 98 S.Ct. 2716, 2720, 57 L.Ed.2d 727 (1978); *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. at 435–436, 54 S.Ct. at 236, *Stone v. Mississippi*, 101 U.S. at 817. And, the Supreme Court has defined "police power" for Contract Clause purposes, "as an exercise of the sovereign right of the Government to protect the lives, health, morals, comforts, and general welfare of the people ...." *Manigault v. Springs*, 199 U.S. 473, 480, 26 S.Ct. 127, 130, 50 L.Ed. 274 (1905). The state's "paramount authority ... is not limited to health, morals and safety. It extends to economic needs as well." *Veix v. Sixth Ward Ass'n*, 310 U.S. 32, 39, 60 S.Ct. 792, 795, 84 L.Ed. 1061 (1940). This doctrine reflects the importance of allowing states to legislate freely on social and economic matters of importance to their citizens, modifying the law to meet changing needs and conditions.

Following this doctrine, and of direct relevance here, the Supreme Court has upheld state laws that invalidated prior contractual obligations in the field of transportation; *see, e.g., New Orleans Pub. Serv. v. New Orleans*, 281 U.S. 682, 50 S.Ct. 449, 74 L.Ed. 1115 (1930); *Denver & R.G.R. Co. v. Den-*

---

52. *See generally* Comment, *Revival of the Contract Clause: Allied Structural Steel Co. v. Spannaus and United States Trust Co. v. New Jersey*, 65 Va.L.Rev. 377, 381–385 (1979).

53. Until very recently, some commentators considered the clause a "dead letter." *See* G. Gunther, Cases and Materials on Constitutional Law 554 (10th ed. 1980); Schwartz, *supra* at 95–96.

ver, 250 U.S. 241, 39 S.Ct. 450, 63 L.Ed. 958 (1919); *Atlantic Coast Line R. Co. v. Goldsboro*, 232 U.S. 548, 558, 34 S.Ct. 364, 58 L.Ed. 721 (1914); *Northern Pac. R. Co. v. Duluth*, 208 U.S. 583, 28 S.Ct. 341, 52 L.Ed. 630 (1908); and, it has upheld newly enacted state labor laws that specifically set aside previously existing contracts to the contrary. *See, e.g., American Federation of Labor v. American Sash Co.*, 335 U.S. 538, 540, 69 S.Ct. 258, 93 L.Ed. 222 (1949); *Lincoln Federal Labor Union v. Northwestern Iron & Metal Co.*, 335 U.S. 525, 531–32, 69 S.Ct. 251, 254–55, 93 L.Ed. 212 (1949).

■ An examination of the relevant interests in this case suggests those of the Transit Union are weak and those of the Commonwealth of Massachusetts correspondingly strong. For one thing, the Transit Union could not *reasonably* have relied upon the continued enforcement of the arbitration provision in the Basic Agreement as necessary protection for the investment of labor by its members. The very uncertainty as to the legality under state law of a contractual arrangement purporting to be perpetual would make reliance upon its lasting unreasonable. *See* p. 638 *supra*. Moreover, the contractual provisions at issue here are concerned with the form of the arbitral process and the procedure for determining wages, hours and working conditions; the provisions themselves do not set those terms.[54] They are thus procedural and therefore more akin to a contractual remedy than a contractual right. The Transit Union and its members cannot easily say what terms will result from the new procedure; or how those terms will differ from those that the prior procedure would have provided. They may fear the new procedure will lead to less favorable substantive terms; but so may creditors have feared that changes in con-

tractual remedies (*e. g.*, abolition of imprisonment for debt) would make it harder to collect their debts. Yet due to the diminished nature of the reliance involved, such procedural changes in remedy have long been allowed. *See* cases cited at p. 639, *supra*. Further this is not a case of investment given to the state with the expectation of the state returning it, securing its return, or returning an equivalent value through the enforcement at issue. The Transit Union's members have received the pay and working conditions they bargained for and in return for which they gave their labor. It is difficult to see how the promise that a particular arbitration procedure would be used indefinitely into the future—beyond the life of the express terms of the existing agreement—could have played more than a small role in an employee's decision to work for the MBTA. Finally, the Commonwealth, as far as possible, has sought to protect reasonable reliance and expectations by applying the laws at issue here only to future negotiations, when contracts expire subsequent to the enactment of those laws.[55]

For another thing, the state's interest in legislating in this area seems sufficiently strong to overcome the prior contract's restraints. Public transportation is vital to the state and to its economy. The difficulties of finding satisfactory methods for resolving labor disputes—particularly in the field of public employment—are well known. D. Bok & J. Dunlop, *supra* at 228 ff. The state plausibly claims that the problems of cost and efficiency are great. One piece of legislation at issue here (Chapter 405) was enacted after a long impasse in bargaining, and the other (Chapter 581) was enacted during a period of fiscal emergency as part of a government effort to keep the

---

54. And, the procedure was itself subject to change through use of the arbitration system.

55. By contrast, in *Subway-Surface Supervisors Ass'n v. New York Transit Authority*, 44 N.Y.2d 101, 375 N.E.2d 384, 404 N.Y.S.2d 323 (1978) and in *Sonoma County Organization of Public Employees v. County of Sonoma*, 23 Cal.3d 296, 152 Cal.Rptr. 903, 591 P.2d 1

(1979), the challenged legislation applied to the financial terms of existing contracts. In the former case, the legislation was upheld as "a necessary and appropriate" measure in a time of emergency. 44 N.Y.2d at 113, 375 N.E.2d at 390, 404 N.Y.S.2d at 329. In the latter case, the court struck down the statute, finding, *inter alia*, that no "emergency" existed.

system from closing down. The state's interests here would seem at least as great as those present in other cases where the Supreme Court upheld a state law's validity. *See, e.g., Stone v. Mississippi, supra* (state forbids lottery despite its grant of a twenty-five year lottery franchise to a firm three years earlier); *Faitoute Iron & Steel Co. v. City of Asbury Park*, 316 U.S. 502, 62 S.Ct. 1129, 86 L.Ed. 1629 (1942) (state law altered a municipal bond contract); *El Paso v. Simmons*, 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965) (state law modified a land-sale contract by reducing redemption period); *Fertilizing Co. v. Hyde Park, supra* (state law rendered company charter valueless); *Atlantic Coast Line R. Co. v. Goldsboro, supra* (state law restricted railway's contractually granted right to operate).

Moreover, it should be kept in mind that the state laws before us interfere with a prior contractual promise only to the extent that the promise would seek to prevent the state from *ever* changing the arbitration system. In other words, the narrow issue we are considering is whether the state can override a promise by one of its authorities made several years before that ties the hands of all future legislatures in an area of great importance to the public, concerning serious problems (labor/wage/cost/efficiency negotiations) where few would claim to have found even a provisionally satisfactory answer, let alone a permanent one. The Supreme Court has written that "the Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty." *United States Trust Co. v. New Jersey*, 431 U.S. at 23, 97 S.Ct. at 1518. We do not believe that the Contract Clause grants the MBTA authority to restrict so significantly the power of future state legislatures.[56]

The Transit Union has pointed out, however, that recently the Supreme Court, in *United States Trust Co. v. New Jersey*, wrote that a state law impairing the state's prior contractual obligation is valid only if "it is reasonable and necessary to serve an important public purpose." 431 U.S. at 25, 97 S.Ct. at 1518. *See also Allied Structural Steel v. Spannaus*, 438 U.S. at 243–244, 247, 98 S.Ct. at 2721–22, 2723. The Union argues that Chapters 405 and 581 are not "reasonable and necessary" because there are other methods available—fare increases for example, that will resolve the MBTA's financial problems. The issue that the Union's claim puts before us is the extent to which we are to defer to the state legislature's judgment on these matters.

If we judge the legislature's actions "in the light of the facts made known or generally assumed," *cf. United States v. Carolene Products Co.*, 304 U.S. 144, 152, 58 S.Ct. 778, 783, 82 L.Ed. 1234 (1937), those actions are supportable. The legislature clearly felt that Chapters 405 and 581 represented a necessary response to the problems before it. We cannot disagree. The record here reveals the seriousness of the problems facing the MBTA and the alternatives that had been tried. We are aware, as the Supreme Judicial Court has pointed out, that the financial crises which beset the MBTA in late 1980 "threatened the availability of essential services of transportation to such an extent as to endanger the health, safety and welfare of the community." *MBTA Advisory Board v. MBTA*, 1981 Mass. Adv.Sh. 403, 407, 417 N.E.2d 7, 11 (1981). The complex controversies revealed by the conflicting affidavits filed in the district court themselves, suggest that there is no "obvious" alternative to the legislature's approach. Thus, even without engaging in the normal presumptions favoring state legislation, *cf. Morse v. Boston*, 253 Mass. 247, 252, 148 N.E. 813, 815 (1925), we would conclude that a legislative judgment that these statutes are both reasonable and necessary is itself a reasonable judgment.

**56.** *Cf. School Committee of Boston v. Boston Teachers Union*, 389 N.E.2d at 973; "Public policy ... may limit the ability of a public employer ... to bind itself to a given contractual provision or to delegate to an arbitrator the power to bind it."; *City of Taunton v. Taunton Branch of Mass. Police Ass'n*, 406 N.E.2d 1298, 1302 (Mass.App.Ct.1980) (legislative wariness of imposing arbitration).

We do not believe that *United States Trust* requires the federal courts to go further to reexamine *de novo* all the factors underlying the legislation and to make a totally independent determination about whether a fare increase or some other alternative would have constituted a "better" statutory solution. It is true that language in *United States Trust* suggests moderately close court scrutiny of legislation that conflicts with prior *public* contracts. To be specific, the Court stated that as to *private* contracts, "in reviewing economic and social regulation ... courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure...." 431 U.S. at 22, 23, 97 S.Ct. at 1517, 1518. But, as to *public* contracts, "complete deference to a legislative assessment of reasonableness and necessity is not appropriate...." 431 U.S. at 26, 97 S.Ct. at 1519. This language itself, however, refers only to the need to avoid "complete" deference, and it is to be contrasted with the dissent's claim that in Contract Clause cases there should be "unusual" deference to the lawmaking authority of state governments. 431 U.S. at 46, 97 S.Ct. at 1529. (Brennan, J., dissenting). The very existence, and nature, of the complex factual controversies revealed in the record before us here support the legislature's judgment even without "complete" deference.

More importantly, *United States Trust* limits its stricter "review" approach to state laws in the "financial" area—laws which impair a state's "financial obligations." Indeed, it characterized the promise before it as "purely financial." 431 U.S. at 25, 97 S.Ct. at 1519. And, it specifically distinguished "as a threshold matter" state actions in other areas which might "fall within the reserved powers that cannot be contracted away." 431 U.S. at 24–25, 97 S.Ct. 1518–1519. In interpreting this language, we note that the *United States Trust* facts presented a paradigm of the type of protection that the Contract Clause was designed to offer—a protection given to those who invested money, time and effort against loss of their investment through explicit repudiation. *See* B. Wright, The Contract Clause of the Constitution 15–16 (1938); Hale, *The Supreme Court and the Contract Clause*, 57 Harv.L.Rev. 512 (1944). Unlike that case, there is no evidence here of any unreasonable effort to impose the costs or burdens of a new legislative policy upon a small group of previous investors, by, for example, depriving them of their investment. There is no reason to examine these provisions under the strict standard applied when rights specifically protected by the Bill of Rights or minority rights protected by the fourteenth amendment are at stake. *See Dandridge v. Williams*, 397 U.S. 471, 484, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970).

Finally, it would be unusually difficult for a federal court to conduct a trial and determine *de novo* the reasonableness and necessity of each detailed provision of these statutes. The difficulties are well illustrated by the affidavits that the parties have submitted. The MBTA, for example, claims that salaries of MBTA workers in every job category are significantly higher than those of Massachusetts state and municipal workers doing comparable work (*e. g.*, MBTA clerk/typists and janitors earn 92 percent more than comparable state employees; machinists earn 84 percent more than comparable state employees; in 1979, two carshifters, one surface operator, one trackman, and one portable compressor operator each earned over $40,000, of which over $20,000 was overtime pay); that the average MBTA employee earns 79 percent more than the average manufacturing industry worker in Massachusetts; that the MBTA's cost per mile is 83 percent higher than the next most inefficient system; that the MBTA lacks flexibility to adjust job assignments or reclassify employees to meet changing needs; that "featherbedding" is rampant; that the MBTA is required to pay overtime rates to an employee during any day he works more than eight hours, even if he does not work more than forty hours that week; that restrictive work rules require the MBTA to hire full-time people for part-time jobs; and that the MBTA is unable unilaterally to subcontract out work.

The MBTA also claims that its efforts to deal with these problems through the established collective bargaining arbitration procedures have proven unsuccessful" and, according to a former chairman, changes in work practices could obviate the need for a fare increase.

The Transit Union strongly denies these allegations. Its affidavits set forth contrary claims. It claims, for example, that the MBTA has not been unsuccessful under existing interest arbitration; that the MBTA has failed to use the bargaining and arbitration processes properly to deal with its problems, that the financial dependence by the MBTA upon tax revenues is largely a result of inadequate farebox revenues; that union work practices are not inflexible; that the MBTA work force is efficient; that the MBTA has been able to subcontract out work; and that the MBTA enjoys above average productivity from its workers.

The district court was able to make a few findings about work rules insofar as the parties could agree about the facts.[57] But to go further and resolve disagreements, the court might well have to pass judgment upon such matters as a proper rate of pay, the way differently constituted arbitration tribunals are likely to function, the ease, as a political matter, of raising taxes or fares, the likely social and economic effects of a

fare increase, the pressures (social and economic) that could lead to serious labor unrest, and so on. Answering these sorts of questions, and thereby determining the "reasonableness and necessity" of a particular statute is a task far better suited to legislators than to judges. Thus, in the case before us, where economic or social legislation is at issue, some deference to the legislature's judgment is surely called for.

In sum, given the small amount of reliance that the Transit Union could reasonably have placed upon the perpetual continuation of the Basic Agreement, the importance of preserving the state's power to legislate in this area, the apparent reasonableness and necessity of the legislation, and the state's efforts to apply the statutes prospectively, thereby minimizing their interference with the parties' reasonable expectations, we hold that Chapters 405 and 581 do not violate the Contract Clause even if, as a matter of state law, the Basic Agreement is still in effect.

### IV

We now turn to the different claim of the other appellee in this case, Lodge 264 of District 38, International Association of Machinists and Aerospace Workers (the "Machinists"). On July 1, 1976, the Machinists and the MBTA entered into their most

---

**57.** In its supplementary memorandum of May 15, 1981, the district court stated:

There appears to be no dispute ... about the existence of the following work rules for whatever significance they may have:

a. Management may not make temporary reassignments of employees to jobs at locations different from their regular assignment.

b. Employees may not be temporarily reclassified to meet unexpected needs.

c. Rapid transit vehicles within a storage yard must be moved by a yard motorman and may not be moved by the regular operators of the vehicles even if there are not enough yard motormen on duty at a particular time. The yard motormen do not do any other work.

d. Employees may not be assigned to two "details".

e. Overtime is paid on the basis of an eight-hour day rather than a 40-hour week, and in any case must first be offered to senior employees on a system-wide bases. An employ-

ee may receive overtime without having worked a full 40-hour week.

f. There is a system-wide bidding for jobs on the basis of seniority.

g. Motormen must be assigned to rail maintenance vehicles, but do not operate the vehicle or participate in maintenance.

h. Schedules once assigned may not be changed to meet shifting rider demands, except on a three-month basis.

i. Penalties must be paid to drivers on split runs if the break exceeds two hours. MBTA pays $2.6 million per year in such penalties.

j. There are restrictions on the hiring of part-time drivers.

I make no findings with respect to the effect of the foregoing work rules, or the justification for them, concerning which I have not heard evidence or argument. Furthermore, I express no opinion as to the relevance of any of the above work rules to any issue before me or before the Court of Appeals.

recent collective bargaining agreement. Article II provided:

> The term of this Agreement shall commence as of January 1, 1976, and shall extend to and include December 31, 1977, and from year to year thereafter, unless either party shall give to the other party a notice . . . of a desire to change or terminate this Agreement.
>
> After receipt of such notice, the Agreement shall be opened up and the change or changes desired by either or both parties shall be considered.

Article XIV(A) provided:

> No Layoff—No employee, in any classification under the jurisdiction of the Association [the Machinists' Union], shall be laid off during the term of this Agreement.

On October 19, 1977, Charles E. Deignan, Business Representative of the Machinists, wrote the MBTA, stating "notification is given that the undersigned hereby wishes to re-open the Agreement. . . ." On October 26, 1977, Robert R. Kiley, Chairman of the MBTA, wrote to Mr. Deignan that "the Authority hereby gives notice that it desires to make changes in the aforesaid Articles of Agreement, as amended." In the following months, the MBTA and the Machinists apparently negotiated, but they reached an impasse in July 1980. Though the Agreement also provided for interest arbitration, they could not agree, in light of Chapters 405 and 581, what form that arbitration should take.

Until March 2, 1981, the MBTA was prevented from making significant changes in the status quo by the state court injunction referred to at page 626 note 21, and pages 636–37 *supra*. On March 3, 1981, however, the MBTA notified the Machinists that it intended to lay off fifty-three employees represented by that union, effective March 21, 1981.

The Machinists then intervened as a plaintiff in this action initiated by the Transit Union. The Machinists claimed protection under the 1974 § 13(c) agreement.[58] They joined the Transit Union in its Supremacy Clause and Contract Clause contentions. And they claimed that, in any event, as a matter of state law, their collective bargaining contract was still in effect and Article XIV of that contract prohibited layoffs.

The district court enjoined the layoff of the Machinists on the basis of state law. It reasoned that the Machinists' contract had, in fact, expired on December 31, 1977, and that the exchange of notices given in October 1977 had operated under the terms of the contract "to cut off the 'year to year' extended term." 511 F.Supp. at 316. However, because it appeared from an "uncontradicted affidavit" submitted by the Machinists that "the parties have treated the agreement as continuing in force up to this time, and have mutually enforced its terms as from time to time amended," 511 F.Supp. at 316–317, the district court ruled that "the MBTA is estopped to deny the continuation in force of the agreement dated January 1, 1976. . . ." *Id.* at 317. The court further stated:

> The proposed layoffs of members of the Machinists' Union is in direct violation of the explicit terms of the collective bargaining agreement, and while they may be justified they are properly the subject of arbitration under the existing agreement before they are effectuated. Such arbitration would not be interest arbitration subject to ch. 405 of the Act of 1978.

*Id.* at 320.

The MBTA appeals this ruling. It argues that it was inappropriate for the district court to invoke the doctrine of equitable estoppel. *See Celluci v. Sun Oil Co.*, 2 Mass. App.Ct. 722, 320 N.E. 919, 923, *aff'd*, 368

---

58. The MBTA contends that while the International Association of Machinists and Aerospace Workers signed the § 13(c) agreement, it did so in its capacity as an organization representing Boston and Maine Railroad employees, not MBTA employees. (Affidavit of Paul J. Murphy, April 29, 1981). In November 1980, the attorney for the Machinists was informed of the MBTA's position that since Lodge 264 was not a signatory to the existing § 13(c) agreement, it could not invoke the protections of that agreement. This issue has not been briefed by any of the parties, and it is not necessary that we decide the matter here.

Mass. 811, 331 N.E.2d 813 (1974). The Machinists disagree. They add that the district court, in any event, should have found that the collective bargaining agreement did not terminate in 1977, that it was only "opened" for changes, and that its terms therefore continue to apply.

We are reluctant to conclude that at the time of its ruling the district court abused its discretion in issuing a preliminary "layoff" injunction. *See National Tank Truck Carriers, Inc. v. Burke*, 608 F.2d 819, 823 (1st Cir. 1979). Yet, we note that the questions presented here are now entirely matters of state law. They are closely related to matters which have been, and may still be, subject to adjudication in the state courts. *See Gallahue v. MBTA, supra.* Moreover, the district court made its equitable estoppel ruling on the basis of what it described as an "uncontradicted affidavit" submitted by the Machinists that "the parties have treated the agreement as continuing in force...." 511 F.Supp. at 316–317. In its brief and in various opposition papers, the MBTA appears to dispute this assumption, thus undercutting a premise fundamental to the district court's reasoning. Also, given our holding here, it now seems unlikely that the Machinists can pursue any related federal claim. In addition, the district court wrote on March 17 that the injunction delaying the layoffs pending grievance arbitration was to remain in effect only for a "reasonable time pending the prompt completion of arbitration." 511 F.Supp. at 321. Under these circumstances, we believe it appropriate for the district court to reconsider the propriety of the injunction in light of present circumstances.

### V

The decision to grant or deny preliminary injunctive relief ordinarily lies within the sound discretion of the trial court. *Grimard v. Carlston*, 567 F.2d 1171, 1173 (1st Cir. 1979). We will not lightly overturn that judgment. *See Maceira v. Pagan*, 649 F.2d 8, 15 (1st Cir. 1981), and cases cited therein. However, the "application of an improper legal standard" or the

"misapplication of the law to particular facts" provides a basis for reversal. *Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981). We have found that Chapters 405 and 581 are constitutionally sound. For this reason, the Transit Union has failed to demonstrate likelihood of success on the merits, a prerequisite to the granting of preliminary injunctive relief. *Id.* at 1009.

*Accordingly, to the extent that it is inconsistent with this opinion, the district court's order of March 17, 1981, as clarified on May 15, 1981, is vacated and the case is remanded for further proceedings consistent with this opinion.*

Before COFFIN, Chief Judge, CAMPBELL, BOWNES and BREYER, Circuit Judges.

### MEMORANDUM AND ORDER
### ON MOTION FOR REHEARING

PER CURIAM.

The plaintiff in these cases, the Transit Union, moves this court to reconsider its decision of September 30, 1981, to rehear this case *en banc*, and to grant an additional thirty days to file a further brief in support of its motions. The parties have had considerable opportunity to argue their position in this case. Initially, when this court considered an application for a stay of the district court's order, the Transit Union filed a brief, a reply brief, and argued orally at hearing. Subsequently, with the court's permission, the Transit Union filed a 100-page brief and a reply brief on the merits; it again participated in oral argument. It has now filed an 11-page brief in support of its present motions. All of these briefs have involved, roughly speaking, the same issues which were considered thoroughly by this court in its September 30, 1981 opinion. We are therefore reluctant, given the demands of other cases, to grant extensions of time, and to invite further briefing.

Moreover, we do not believe that additional briefing is necessary given the argu-

ments that the Transit Union now seeks to raise:

1. The Transit Union states that we did not address the question of whether the Massachusetts state laws violate the Contract Clause of the Constitution through conflict with the 1974 § 13(c) assurances that the Transit Union and the MBTA made to the Secretary of Labor; rather, our Contract Clause discussion focused upon the 1973 Basic Agreement between the Transit Union and the MBTA. It is true that the parties did not argue the "§ 13(c)/Contract Clause" issue as a separate matter before us. But, had they done so, the result would have been the same. We held that Congress intended that § 13(c) assurances be subject to specific state statutes to the contrary. Consequently, any § 13(c) agreement was made subject to possible state enactment of a conflicting statute. Hence, such a statute could not have impaired the obligations of the "contract" (if it was one).

2. The Transit Union argues that we ought not to have applied the standard of *Schwartz v. Texas*, 344 U.S. 199, 73 S.Ct. 232, 97 L.Ed. 231 (1952), requiring a clear showing of congressional intent to preempt a field. Since we are dealing with the question of whether Congress intended a set of lengthy, detailed, specific assurances, presented to the Secretary of Labor by private parties to prevail over state law to the contrary, the *Schwartz* standard would seem appropriate. But even if it is not, the result would not change. Our review of the relevant legislative history, set out in the opinion, makes clear that Congress did not intend the detailed, local assurances negotiated under § 13(c) to invalidate ·specific state laws to the contrary.

3. The Transit Union reiterates its view that our decision conflicts with the law in other circuits. We discussed the views of other circuits, including that of the Sixth Circuit and Eighth Circuit, in our opinion. We concluded that contrary views, for the most part, are expressed in dicta or alternative holdings. We found no other opinion that explored the issue in depth. None of the cases cited involves the type of conflict

between state law and § 13(c) assurances present here, namely, state law that takes the form of a specific, clear state statute, directly and purposefully aimed at local transit problems (and an ambiguously worded § 13(c) agreement made several years before). We remain convinced that there is not yet any significant conflict on this issue among the circuits. But, in any event, for reasons previously set out, we have not followed the approach that the Transit Union believes the opinions that it cites suggest.

4. The Transit Union points to legislative history showing that § 13(c) was amended by Senator Morse and states that the amendment makes the difference. This court previously reviewed the entire legislative history of the statute, including the Morse amendment. That amendment was directed at the *terms* of the § 13(c) assurance, not at the question of whether the assurance was designed to supersede state law. Indeed, as the opinion points out, Senator Morse himself subsequently stated that the "state can continue its [conflicting] policy if it wishes to; but ... the State should not be allowed to receive Federal money...."

5. The Transit Union states that a rehearing *en banc* is required because we have modified a prior decision, *Local Division 714, Amalgamated Transit Union v. Greater Portland Transit District*, 589 F.2d 1 (1st Cir. 1978). The "question of when to hold, or when not to hold, an *en banc* hearing is within the discretion of this court." *United States v. Martorano*, 620 F.2d 912 (1st Cir. 1980); Fed.R.App.P. 35(a). As we pointed out, we have not overruled *Greater Portland*. *Greater Portland* holds that the federal courts have jurisdiction to enforce § 13(c) agreements. We stated that we· would not follow language in that opinion insofar as it might be read to suggest that a § 13(c) assurance automatically prevails over conflicting state law. *Greater Portland* will still offer both jurisdiction and meaningful relief in other cases.

6. The Transit Union makes other arguments related to the enforceability of

§ 13(c) and potential conflict between state law and that statute. We have discussed these issues in the opinion, describing the discretion that Congress meant to confer upon the Secretary of Labor and concluding that the Secretary maintains authority to prevent violation of the statute.

This cursory review of the issues the Transit Union now raises is meant to suggest that, for the most part, its arguments are dealt with more thoroughly in our previous opinion and that its other arguments do not provide adequate reason for a rehearing or a rehearing *en banc*. Consequently, the motions for a rehearing, rehearing *en banc*, and for an extension of time to file a further brief are denied.